IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION No. 07-169 |
| | : | |
| v. | : | CIVIL ACTION No. 11-4269 |
| | : | |
| CHARLES DUKES | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                **September 30, 2014**

Defendant Charles Dukes, a prisoner in federal custody, has filed a pro se motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255, raising a host of claims regarding the validity of his conviction and sentence on federal drug and gun possession charges. Dukes asserts he is actually innocent of the offenses of which he was convicted, arguing he was convicted on the basis of perjured testimony and planted and fabricated evidence, in violation of his right to due process, and the evidence at trial was insufficient to prove he constructively possessed the gun recovered from the garage where he was arrested. Dukes also seeks relief based on alleged Fourth Amendment violations by the police, due process violations by this Court and the prosecutor, and ineffective assistance of counsel both at trial and on direct appeal. Because the record conclusively shows Dukes is not entitled to relief on any of the grounds asserted in his § 2255 motion or the numerous amendments thereto, the motion will be denied without an evidentiary hearing.

## BACKGROUND

In March 2007, Dukes was indicted on charges of possessing with intent to distribute 5 grams of more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count 1); possessing with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count 2); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.

§ 924(c) (Count 3); and possession of a firearm by a convicted felon, in violation of 18 U.S.C.

§ 922(g) (Count 4).  Following his indictment, Dukes, who was already in state custody, was

represented by Attorney Elizabeth L. Toplin of the Federal Community Defender Office for the

Eastern District of Pennsylvania (Federal Defender Office) in connection with the federal

charges.  In July 2007, the Federal Defender Office filed motions to suppress physical evidence

Philadelphia police officers had seized from the garage and residence where Dukes was arrested,

and statements Dukes made to the police the day after his arrest.  Dukes thereafter sought to

dismiss the Federal Defender Office as counsel.  Although this Court initially denied Dukes's

request, in August 2007, this Court granted the Federal Defender Office's motion to withdraw as

Dukes's counsel[1] and appointed Attorney William Brennan to represent him pursuant to the

Criminal Justice Act (CJA), 18 U.S.C. § 3006A.  In June 2008, Attorney Brennan filed a further

motion to suppress all physical evidence seized from Dukes's residence at 7705 Temple Road.

The motion also requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to

challenge the accuracy of the allegations in support of the search warrant.

On June 19, 2008, this Court held a hearing on Dukes's suppression motions, at which

Philadelphia Police Officers Frank Bonett, Charles Kapusniak, and Perry Betts testified.[2]

According to Officer Bonett's testimony, on the night of August 16, 2006, acting on information

he received from a reliable confidential source that a father and son were selling drugs out of the

rear garage at 7705 Temple Road, Bonett and two colleagues (Officers Thomas LaCorte and

Fred Wiley) set up surveillance in the alley where the garage was located, three houses away.

---

[1] The Federal Defender Office moved to withdraw from the case after Dukes left numerous telephone messages accusing counsel of being racist and working for and with the prosecuting attorney.

[2] Philadelphia Detective David Plummer also testified at the suppression hearing as a rebuttal witness.

The officers were in full uniform in an unmarked police car.  At around 10:30 p.m., Officer Bonett observed Dukes walk through the alley and open the door to the garage of the residence at 7705 Temple Road.  Approximately five minutes after Dukes's arrival, Officer Bonett saw a black Ford Taurus station wagon pull into the area in front of the garage, and observed Dukes approach the passenger side of the car and talk briefly with the driver, who handed Dukes money.  Dukes re-entered the garage for about ten seconds, then returned to the car and handed the driver unidentified small objects.  About ten minutes later, Officer Bonett saw a white Honda Accord pull into the area in front of the garage at 7705 Temple Road and observed the same pattern of activity, with Dukes taking money from the driver, re-entering the garage, and then returning to the car and handing the driver unidentified small objects.

At approximately 10:50 p.m., after observing Dukes engage in what Officer Bonett believed, based on his experience and training as a police officer, were narcotics transactions, he and the other officers exited their vehicle and approached Dukes.  Upon seeing the officers, Dukes attempted to close the garage door, but Officer LaCorte prevented him from doing so.  Officers Bonett and Wiley then stopped Dukes, and, looking through the open garage door, Officer Bonett saw in plain view a clear plastic baggie containing small green-tinted packets of what he believed was crack cocaine.  The officers then placed Dukes under arrest and searched his person, seizing $470 in cash, a Nextel cell phone, and a large wallet containing numerous credit cards and a social security card.  After making the arrest, Officer Bonett reported the incident to Narcotics Strike Force Officer Kapusniak so that a search warrant could be obtained for 7705 Temple Road.

Officer Kapusniak testified at the suppression hearing regarding his role in obtaining and executing a search warrant for 7705 Temple Road.  Based on the information provided by

Officer Bonett, Officer Kapusniak prepared an affidavit of probable cause and faxed it to the District Attorney's Charging Unit, which approved the warrant.  At approximately 6:01 a.m. on August 17, 2006, Officer Kapusniak executed the warrant, recovering several clear baggies containing chunks of an off-white substance, 150 green-tinted packets containing smaller chunks of an off-white substance, a black grinder, a glass plate with white residue on it, two bottles of inositol, $2,670 in cash, a silver gun box containing a loaded Smith & Wesson handgun,[3] and a bill and Pennsylvania driver's license in the name of Charles Dukes.[4]  After returning to police headquarters, Officer Kapusniak performed a field test on the chunky white substance and determined the substance was cocaine base.  Given the large quantity of drugs recovered, Officer Kapusniak notified Narcotics Field Unit Officers Michael Spicer and Perry Betts of the seizure, suggesting Dukes might someone with whom Spicer and Betts would be interested in speaking in connection with the investigations handled by their Unit.

According to Betts, who also testified at the suppression hearing, he and Officer Spicer met with Dukes on August 17, 2006, at the police district where Dukes was being held.  After Spicer read Dukes *Miranda* warnings, Dukes waived his *Miranda* rights and proceeded to talk to the officers, providing them with information regarding other local criminal activity, some of which the officers later corroborated.[5]

---

[3] The police later determined the gun was registered to Dukes's son, Charles S. Dukes.

[4] Officer Kapusniak testified that some of drugs—a clear baggie containing 49 green-tinted packets of the off-white substance and a brown paper bag containing two clear baggies with chunks of the off-white substance—were in plain view on a makeshift table inside the garage, while most of the rest of the drugs were found inside a cooler in the garage.  *See* Hr'g Tr. 78-81, June 19, 2006.  Officer Kapusniak stated he recovered one of the green-tinted packets from inside the gun box.  *See id.* at 81.

[5] By Officer Betts's account, Dukes told the officers he had seen some kids put a shotgun under a dresser or some cabinets in the rear yard of 7740 Temple Road.  Later the same day, the officers

4

Dukes also testified at the suppression hearing, offering a dramatically different account of the events in question.  According to Dukes, he left a local Shop Rite store at 10:06 p.m. on August 15, 2006, and drove to his mother's home at 7705 Temple Road to drop off some laundry detergent he had purchased for her.  At 10:19 p.m., Dukes got out of his car, put the two boxes of detergent in the garage, and closed the garage door, whereupon he encountered Officer Bonett, in plain clothes, outside the garage.  Officer Bonett hit Dukes, knocking his cell phone to the ground.  Dukes retrieved his phone and in trying to activate the video feature saw the time was 10:21 p.m.  Dukes claimed Officer Bonett hit him again and handcuffed him while the other officers rummaged through the contents of the garage.  Dukes denied that the drug transactions Officer Bonett described ever occurred, noting the officers had already arrested him when the transactions allegedly took place.  To support his account, Dukes offered a cell phone video a neighbor had recorded, which he contended showed the officers running in and out of the garage between 10:30 and 10:36 p.m., when Dukes was supposedly engaging in drug transactions.  The video, however, was not authenticated, did not bear any indication of date or time, and depicted only what this Court characterized as "gray and random flashes of light."  Mem. 4, June 30, 2008, ECF No. 91.  Dukes also denied ever meeting or speaking with Officers Betts and Spicer, and denied giving them any information about other criminal activity, though he admitted certain

---

recovered a shotgun from the location Dukes identified.  The property receipt for the shotgun the officers recovered was introduced at the hearing.  Dukes also told the officers about a local man named Steve, who was wanted in Wichita, Kansas, for nine kilograms of cocaine, and identified some of Steve's associates.  Officers Betts and Spicer did not take a formal statement from Dukes, but instead jotted down some notes regarding the information he provided.  The officers did not question Dukes about his arrest or the items recovered pursuant to the search warrant.

information in the officers' notes of the meeting was correct (e.g., his date of birth and nickname ("Dog")).[6]

On June 30, 2008, this Court issued a Memorandum and Order denying Dukes's suppression motions.  Based on the Court's observation of the witnesses at the suppression hearing and the evidence introduced at the hearing, the Court found the testimony of Officers Bonett, Kapusniak, and Betts credible, and found Dukes's testimony not credible, given the lack of evidentiary support for Dukes's version of events and the contradictions between Dukes's account and other record evidence.  The Court also noted Dukes's prior *crimen falsi* convictions for wire and bank fraud cast doubt on his veracity.  The Court concluded, based on the totality of the circumstances, that Officer Bonett had probable cause to arrest Dukes and the search warrant obtained following the arrest was also supported by probable cause.  The Court therefore concluded the items seized during the search of Dukes's person incident to arrest and in executing the search warrant were admissible.  The Court also held Dukes's statements to Officers Betts and Spicer would not be suppressed, as the statements were made pursuant to a valid waiver of his *Miranda* rights.  Finding Dukes's testimony regarding the events in question was not credible, the Court denied Dukes's request for a *Franks* hearing.

Following the denial of his suppression motions, Dukes filed several pro se motions seeking to have a new attorney from the Federal Defender Office represent him, to have his existing attorney removed from the case, and/or to exercise his Sixth Amendment right to represent himself at trial.  The Court conducted a lengthy colloquy with Dukes regarding these

---

[6] To rebut Dukes's denial of ever meeting with Officers Betts and Spicer, the Government called Detective David Plummer, the case agent on Dukes's case at the time of the hearing.  Detective Plummer testified that at a prior meeting with the Government in connection with efforts to obtain a proffer from him, Dukes reviewed what Betts identified as his and Spicer's notes of their meeting with Dukes on August 17, 2006, and stated he knew every name mentioned in the notes.

motions on August 8, 2008, and, at the conclusion of the hearing, advised Dukes the Court would not appoint another new lawyer, but would permit him to represent himself, with Attorney Brennan as standby counsel.  Dukes thereafter filed a motion to continue the August 18, 2008, trial date, which the Court initially denied.  On August 14, 2008, four days before trial was to commence, Attorney Arnold C. Joseph entered his appearance as Dukes's counsel.  Attorney Joseph sought reconsideration of the Court's denial of Dukes's pro se continuance request, and, after a further colloquy with Dukes on August 18, 2008, the Court granted the motion.

The case proceeded to trial in October 2008.  At trial, the Government's witnesses included Officer Bonett, who testified about his surveillance of Dukes on August 16, 2006, the events leading to Dukes's arrest, and the items seized from Dukes's person, and Officer Kapusniak, who testified about obtaining and executing a search warrant based on information provided by Officer Bonett.[7]  Neither Officer Betts nor Officer Spicer testified for the Government, and Dukes did not testify in his own defense.[8]  On October 23, 2008, the jury returned a guilty verdict on all counts.

---

[7] The Government also called several other law enforcement witnesses, including Officer Wiley, who participated in the surveillance and arrest of Dukes on August 16, 2006.

[8] During trial, the Government sought to call Officer Betts to testify that when he and Officer Spicer met with Dukes on August 17, 2006, Dukes told them there was a gun in the garage, thereby demonstrating his knowledge of the gun, which was registered to his son.  See Trial Tr. 158, 161-62, Oct. 21, 2008.  Officer Betts did not mention Dukes's statement about the gun at the suppression hearing, but did mention it when interviewed in connection with an Internal Affairs Division (IAD) investigation regarding a complaint Dukes had filed against Officer Bonett.  See id. at 162-63; Dukes Ex. Y, at 6, ECF No. 212 (IAD investigation report).  After hearing argument from the parties, the Court ruled that the Government would not be permitted to introduce Dukes's statement regarding the gun in its case in chief, but reserved ruling as to whether the statement would be admissible on rebuttal in the event Dukes testified or otherwise presented evidence suggesting he was not aware the gun was in the garage.  See Trial Tr. 166, Oct. 21, 2008.  The Court ultimately ruled that if Dukes testified, the Government would be permitted to cross-examine him about the statement and would be permitted to attack the credibility of Dukes's denial of ever having met with Officers Betts and Spicer with the

In January 2009, prior to sentencing, Attorney Joseph filed a motion requesting the Court either permit him to withdraw due to Dukes's failure to pay him or appoint him to represent Dukes as CJA counsel. The Court held a hearing on the motion on January 20, 2009, at which Attorney Joseph explained that he came to represent Dukes after another inmate at the Federal Detention Center contacted him on Dukes's behalf and promised to pay for the representation. The other inmate did not pay Joseph, however, and after the trial, Dukes accused Joseph of failing to zealously represent him because Joseph had not been paid. Joseph explained that in light of Dukes's allegations and in an abundance of caution, he filed the motion to withdraw or for appointment so as to ensure there would be no impediment to his continued representation because of financial considerations. After consulting with Joseph during the hearing, Dukes indicated he wanted Joseph to continue to represent him at sentencing and on direct appeal. By Order of January 22, 2009, the Court appointed Joseph as CJA counsel prospectively, but reserved ruling on the issue of whether the appointment would be retroactive pending further briefing.

The case proceeded to sentencing on February 3, 2009, but the Court did not impose sentence that day. Rather, after hearing from the Government and from Dukes himself—who used his allocution to repeat his attacks on the police officer who arrested him, his lawyer, the Assistant United States Attorney (AUSA) who prosecuted the case, and the Court—the Court advised the parties it had reservations whether a sentence within the applicable range under the

---

information he gave to them during the meeting. *See* Trial Tr. 4, 8-9, Oct. 22, 2008. The Court had earlier ruled that the Government would be permitted to use Dukes's 2001 bank fraud conviction and 2003 wire fraud conviction to impeach Dukes's credibility in the event he testified. *See* Order, Oct. 20, 2008, ECF No. 121; *see also* Order, Oct. 20, 2008, ECF No. 122 (granting in part the Government's motion to permit cross-examination of Dukes with evidence of his prior false statements in connection with his bank and wire fraud convictions). Because Dukes did not testify, none of this evidence was admitted.

federal Sentencing Guidelines was adequate, and was contemplating varying or departing upward from the otherwise applicable sentencing range.[9]  The Court adjourned the hearing to permit further briefing and consideration of the propriety of an above-Guidelines sentence.  On March 11, 2009, the Court sentenced Dukes to a total of 300 months of incarceration, which included a 65-month upward variance from the applicable Guidelines range.  The Court found an upward variance was justified due to Dukes's "substantial criminal history, his inability to conform his conduct to the law during Court supervision, likelihood to re-offend, contempt for the law and legal system, and lack of remorse for his conduct."  Sentencing Hr'g Tr. 23, Mar. 11, 2009.[10]

Dukes thereafter appealed, represented by new, retained counsel, Attorney Mark Greenberg, who challenged this Court's denial of Dukes's motions to suppress physical evidence and imposition of an above-Guidelines sentence.  In an opinion filed on July 21, 2010, the Third Circuit affirmed, finding this Court "properly denied all of Dukes's motions to suppress physical evidence" and did not impose a substantively unreasonable sentence.  *United States v. Dukes*, 387 F. App'x 196, 200-01 (3d Cir. 2010).  After the appeal was decided, Attorney Greenberg moved to withdraw as Dukes's counsel, at Dukes's request.  The Third Circuit granted the motion on September 16, 2010.

---

[9] With a total offense level of 28 and a criminal history category of VI, Dukes's advisory Guidelines range was 140 to 175 months.  Taking into account the five-year mandatory minimum sentence on Count 3, Dukes's effective advisory Guidelines range was 200 to 235 months.

[10] After sentencing (and after filing a notice of appeal on Dukes's behalf), Attorney Joseph filed a motion requesting the Court to make his CJA appointment retroactive to August 14, 2008, the date he entered his appearance for Dukes in this case.  On June 23, 2009, the Court granted the motion, allowing Joseph to seek payment for his work on the case from August 14, 2008, through June 1, 2009.

In June 2011, Dukes filed the instant pro se motion pursuant to § 2255, which has been the subject of numerous revisions and amendments.[11]  In his wide-ranging motion, Dukes raises five categories of claims:  (1) actual innocence of the offenses charged, (2) Fourth Amendment violations based on the allegedly unlawful seizure of Dukes's person and search of the residence where he was arrested, (3) Fifth Amendment due process violations by the Court, (4) prosecutorial misconduct, and (5) ineffective assistance of trial and appellate counsel.

In January 2012, while his § 2255 motion was pending and before the Government's response was filed, Dukes filed a motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(2) based on Amendment 750 to the Sentencing Guidelines.[12]  Amendment 750 implemented the Fair Sentencing Act of 2010 by "reduc[ing] the crack-related offense levels in § 2D1.1 of the Guidelines," and was made retroactive effective November 1, 2011. *United States v. Berberena*, 694 F.3d 514, 517-18 (3d Cir. 2012).  The Amendment had the effect of reducing Dukes's offense level by two levels, from 28 to 26, resulting in a reduced effective advisory Guidelines range of 180 to 210 months.[13]  Following a hearing on July 12, 2012, the Court granted Dukes's sentence reduction motion and reduced his overall sentence by a total of 104 months.  The reduced 196-month sentence imposed was within the new effective advisory Guidelines range of

---

[11] Upon filing his § 2255 motion, Dukes wrote to the Court noting he had filed the motion prior to the expiration of the one-year limitation period and stating he anticipated filing certain revisions, amendments, and materials in support of the motion.  In light of these representations and at Dukes's and the Government's request, briefing on the motion was deferred until after he made some of these additional submissions.

[12] The Federal Defender Office represented Dukes solely for sentence reduction purposes.

[13] With a total offense level of 26 and criminal history category of VI, Dukes's new effective advisory Guidelines range was 120 to 150 months, plus 60 months consecutive on Count 3, for a total of 180 to 210 months.

180 to 210 months, and eliminated the 65-month upward variance the Court had originally imposed.

Beginning in January 2013, Dukes filed a series of amendments to his pending § 2255 motion based on media articles reporting on serious allegations of misconduct by a group of Philadelphia Narcotics Field Unit officers, including Officers Betts and Spicer, the two officers who this Court found interviewed Dukes the day after his arrest.  In particular, Dukes alerted this Court to *Philadelphia Daily News* articles reporting that in December 2012, the Philadelphia District Attorney's Office had dropped the charges in 41 drug cases based on concerns about the credibility of certain narcotics officers whose testimony was necessary for the prosecutions.  *See* ECF No. 242.[14]   The articles also reported that Philadelphia Police Commissioner Charles Ramsey had transferred six Narcotics Field Unit officers, including Betts and Spicer, out of narcotics after District Attorney Seth Williams advised Ramsey his office would no longer call the officers to testify in drug cases, *see id.*, and that the U.S. Attorney's Office had declined to use five of the officers, including Betts and Spicer, as witnesses in federal drug cases for at least two years, *see* ECF No. 243.  Dukes also provided the Court with articles reporting on civil suits filed against the discredited Narcotics Field Unit officers and others, including one suit in which Officer Kapusniak was named as a defendant.  *See* ECF Nos. 246, 248.

By Order of July 24, 2013, this Court directed the Government to respond to Dukes's amendments pertaining to the discredited narcotics officers and to address the impact of the revelations regarding the officers' misconduct on Dukes's § 2255 motion and any further proceedings that might be warranted in light of the revelations.  The Government filed its

---

[14] In light of the large number of filings Dukes has made in this case and for ease of reference, citations to Dukes's submissions are to the document number assigned by the electronic case filing system.

response in November 2013.  According to a later *Philadelphia Daily News* article provided by Dukes, Commissioner Ramsey relieved Officers Betts and Spicer and three other discredited narcotics officers of their police powers in January 2014, due to a pending federal grand jury investigation.  In August 2014, the grand jury indicted Betts, Spicer, and four other former Narcotics Field Unit Officers on various federal offenses.  The indictment charges the officers with being part of a racketeering conspiracy from February 2006 to November 2012, and charges Betts and Spicer with separate counts of conspiracy to deprive suspects of civil rights, deprivation of civil rights, robbery which interferes with interstate commerce, extortion which interferes with interstate commerce, using and carrying a firearm during and in relation to a crime of violence, and/or falsification of records in a federal investigation.  *See United States v. Liciardello*, Crim. No. 14-412, Indictment (E.D. Pa. filed July 29, 2014).

**DISCUSSION**

Pursuant to 28 U.S.C. § 2255, a prisoner in federal custody may move the sentencing court to vacate, set aside, or correct his sentence if "the sentence was imposed in violation of the Constitution or laws of the United States, . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law[ ] or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  In evaluating a § 2255 motion, the court "must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record" and "must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the movant is not entitled to relief." *Gov't of the V.I. v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989).

**A.      Due Process Violations Based on "Actual Innocence"**

As part of his claim invoking "actual innocence," Dukes asserts he was convicted on the basis of perjured testimony and planted and fabricated evidence, in violation of his right to due process.  Dukes argues (1) Officer Bonett's account of having arrested him shortly after 10:50 p.m. on August 16, 2006, and only after observing him engage in what appeared to be two narcotics transactions and seeing what appeared to be crack cocaine in plain view on a table inside the garage, was a lie; (2) Officer Kapusniak testified falsely regarding the search of 7705 Temple Road and planted at least some of the crack cocaine in the garage; and (3) Officer Betts's suppression hearing testimony about a meeting with Dukes in which Dukes provided Betts and Spicer with information about other local criminal activity was entirely fabricated.

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State," violates due process.  *Sistrunk v. Rozum*, 674 F.3d 181, 187 (3d Cir. 2012) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  The provision of false testimony by a government witness without the government's knowledge may also violate due process "if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) (alteration in original) (citation and internal quotation marks omitted); *see also Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding a prosecutor's unknowing use of perjured testimony requires a conviction to be set aside if "there is a reasonable probability that [without all the perjury] the result of the proceeding would have been different" (alteration in original) (citation omitted)).  The Court need not decide which standard applies here, as Dukes has not shown any of the officers who testified against him at trial perjured themselves or that any of the physical evidence against him was fabricated.

13

The linchpin of Dukes's claim that Officer Bonett lied is the cell phone video allegedly taken by Dukes's neighbor on August 16, 2006, which Dukes contends depicts a marked police car in the alley behind 7705 Temple Road and police officers ransacking the garage at that address between 10:30 and 10:36 p.m., when Dukes was purportedly engaging in the drug transactions that led Officer Bonett to approach him.  Dukes argues police records regarding his arrest—including the "75-48" incident report, the computer aided dispatch (or "CAD") printout, and the "application for search and/or extract of police incident or offense report"—corroborate the video in that the records reflect a 10:25 p.m. "time of occurrence" or "dispatch" time, which Dukes contends means he was already in custody at 10:25 p.m.[15]

This Court reviewed the cell phone video at the suppression hearing and found that, contrary to Dukes's description, the video did "not indicate either the date, or time" and depicted only "gray and random flashes of light," Mem. 4, June 30, 2008, ECF No. 91, a characterization the Third Circuit described as "apt[]," *Dukes*, 387 F. App'x at 200.  Although Dukes has produced some evidence suggesting that the video clips were associated with the 10:30–10:36 p.m. time frame on August 16, 2006, *see* Dukes Ex. R, the video was never authenticated and does not corroborate Dukes's version of the circumstances surrounding his arrest in any event.[16]  Dukes's contentions regarding the meaning of the 10:25 p.m. reference in the various

---

[15] The 75-48 report, CAD printout, and application/extract report are Exhibits C, W, and X in Dukes's Appendix of Exhibits, ECF No. 212.

[16] Because of the lack of authentication and poor quality of the video, the Government moved in limine to exclude the video at trial, arguing it had no probative value on the contested issue of when Dukes was in custody and would serve only to confuse the issues and mislead the jurors. *See* Gov't's Mot. in Limine to Prohibit Introduction of Cell Phone Video, ECF No. 117.  The motion was ultimately rendered moot, as Dukes was unable to locate the individual who recorded the video and, lacking any means of authenticating the video, did not seek to introduce it at trial. *See* Hr'g Tr. 6-7, Oct. 20, 2008.

police reports and records concerning the incident were also explored both at the suppression hearing and at trial. Contrary to Dukes's interpretation, Officer Bonnet testified the occurrence time reflected in the paperwork corresponded not to the time Dukes was arrested but to the time the investigation was recorded in the police dispatch system, which occurred when Bonnet told the dispatcher, in response to her attempt to give his unit an assignment, to hold the unit out for investigation at 7705 Temple Road. *See* Hr'g Tr. 34-41, June 19, 2008; Trial Tr. 138-41, 178-80, Oct. 21, 2008. The entry of the investigation into the system is what triggered the obligation to complete paperwork regarding the occurrence; therefore, the time the entry was made is the time of occurrence for purposes of completing the paperwork. *See* Trial Tr. 179-180, Oct. 21, 2008. Although Dukes maintains Officer Bonett's explanation is implausible, this Court credited Bonett's testimony, as did the jury. Dukes's disagreement with the Court's and the jury's assessment of Officer Bonett's credibility is not a basis to conclude Bonett's testimony was perjured.

The other evidence on which Dukes relies in support of his claim that Officer Bonett testified falsely is similarly lacking. Dukes maintains, for example, that his cell phone records for August 16 and 17, 2006, prove police officers used his cell phone after the phone was seized from him.[17] The records provided by Dukes show nine incoming calls to his cell phone between 10:41 p.m. on August 16, 2006, and 2:35 a.m. on August 17, 2006. *See* Dukes Ex. V, ECF No. 212. The records do not indicate whether the calls were answered or went to voicemail, and thus fail to establish the officers' use of the phone after Dukes's arrest. Nor is it clear how the officers' use of the phone (even if established) would "corroborate [Dukes's] version of events of

---

[17]   Although Dukes characterizes the cell phone records as "newly discovered," this characterization is incorrect, as the records were clearly available at the time of the suppression hearing and trial, even if Dukes did not obtain them until February 2010.

police misconduct in the act of corruption and fabrication of incident occurrence details" in any event.  *See* ECF No. 210 at 3.[18]

Dukes also refers to a January 8, 2008, letter from AUSA William Inden to Attorney Brennan in which the AUSA notes the presence of "many other officers on the scene" on the night of Dukes's arrest.  *See* Dukes Ex. S.  Dukes contends this observation contradicts Officer Bonett's testimony at the suppression hearing that he was unable to apprehend the other parties to the drug transactions he observed due to a lack of backup.  But Officer Bonett never testified there were no other officers assigned to his district on the night of August 16, 2006, only that there was insufficient manpower that night to have the suspected drug purchasers stopped.  As the Government notes, the availability of other officers to assist in the important task of securing the scene after Dukes's arrest does not undercut Officer Bonett's testimony that a shortage of officers existed to assist with arresting Dukes's drug customers.

Dukes's purported reliance on the grand jury testimony of Detective Adrienne Hilliard, the original case agent on his case, is also misplaced.  Asserting, without foundation, that Detective Hilliard had not reviewed either the 75-48 or the CAD report prior to testifying before the grand jury, Dukes speculates that Officer Bonett withheld these materials from her and that had she known about the 10:25 p.m. response time reflected in the reports, she would have uncovered the falsity of Bonett's account.  *See* ECF No. 220 at 1-2.  This argument is based on nothing more than speculation.  Detective Hilliard testified that as the assigned investigator for this incident, she "review[ed] police paperwork, . . . talk[e]d to various witnesses, t[ook] photographs of the scene, . . . review[ed] laboratory results, and talk[ed] to expert witnesses."

---

[18] Curiously, Dukes's phone records do not reflect the call Dukes's girlfriend claimed to have made to Dukes's phone at 10:28 p.m. on August 16, which someone other than Dukes allegedly answered.

Grand Jury Tr. 2-3, Mar. 13, 2007.  While Detective Hilliard did not identify the particular items of police paperwork she reviewed, there is no basis to conclude Officer Bonett withheld the 75-48 or the CAD report from her.  Even if Detective Hilliard did not review these items prior to testifying, there is no basis to infer she would have concluded Officer Bonett's account was fabricated.[19]

In arguing Officer Kapusniak testified falsely at the suppression hearing and at trial and planted evidence in the garage and residence at 7705 Temple Road, Dukes again relies on perceived inconsistencies in the record that were explored during the suppression hearing and/or at trial and rejected by this Court and/or the jury, which credited Kapusniak's testimony.[20]

---

[19] Dukes's speculation that Officer Bonett or one of the other officers on the scene planted his driver's license inside the house at 7705 Temple Road is also baseless.  Dukes claims the recovery of his license from inside the house is inconsistent with Officer Bonett's alleged preliminary hearing testimony that Officer Wiley recovered Dukes's "identification" in the search of his person incident to arrest.  But both Officer Bonett and Officer Wiley claimed to have recovered Dukes's social security card, not his license, at the time of his arrest.  *See* Trial Tr. 76, 135-37, 182, 197, Oct. 21, 2008.  At trial, as part of the defense argument that the officers involved in Dukes's arrest were lying, defense counsel suggested Dukes's license was placed inside the house when Officer Wiley (who took possession of the wallet after seizing it) and others briefly entered to secure it following Dukes's arrest.  The jury apparently rejected this argument, and Dukes has provided this Court with no basis to conclude otherwise.

[20] Dukes argues Officer Kapusniak lied in claiming to have recovered a single packet of what was later determined to be crack cocaine inside the gun case, noting that at the preliminary hearing, Kapusniak stated he recovered the single packet of drugs from the floor.  Officer Kapusniak was cross-examined about this inconsistency at the suppression hearing and at trial, and in both instances, he insisted the transcript of his preliminary hearing testimony was incorrect.  *See* Hr'g Tr. 85-87, June 19, 2008 ("There was definitely a green packet recovered from inside the gun box."); Trial Tr. 257-63, Oct. 21, 2008 (asserting the preliminary hearing transcript was incorrect because "the one green packet was 110 percent inside the gun box with the gun").  The property receipt Officer Kapusniak prepared the same day he executed the search warrant in this case, three months before the preliminary hearing took place, corroborated his testimony that he found a single packet of suspected crack cocaine inside the gun box.  *See* Trial Tr. 277-79, Oct. 21, 2008.

Dukes also cites the inconsistency between Officer Kapusniak's testimony that he performed a field test on the drugs seized from the garage after completing the search of the premises around 7:30 a.m. on August 17 and returning to the Narcotics Strike Force

Neither Dukes's attempt to reargue these points, nor the additional evidence he cites provides a

basis for this Court to conclude Officer Kapusniak was a source of false or fabricated evidence in

this case.

Dukes argues allegations that have been made against Officer Kapusniak in civil lawsuits

arising out of the scandal involving the discredited Narcotics Field Unit officers, including Betts

and Spicer, prove Officer Kapusniak and the other officers fabricated evidence in this case.  The

---

headquarters, and the actual field test report, which shows the time of the field test as 7:00 a.m.
When asked about this inconsistency on cross-examination at trial, Officer Kapusniak admitted
the time on the field test report was a mistake.  *See id.* at 269.  Although defense counsel argued
in closing that this inconsistency was a reason to doubt the Government's account of the
investigation of Dukes, the jury apparently credited Officer Kapusniak's testimony.
        In addition, Dukes maintains Officer Kapusniak fabricated his account of finding a brown
paper bag containing crack cocaine on the same makeshift table where the plastic baggie of crack
cocaine was located, noting this account was contradicted by Officer Bonett, who claimed to
have seen only the plastic baggie of drugs when he looked inside the garage.  Dukes contends this
discrepancy supports the inference that the brown paper bag of drugs was planted in the garage,
but the fact that Officer Bonett, who did not enter the garage, may have failed to perceive all of
the drug evidence that Officer Kapusniak later recovered after a thorough search of the garage is
unremarkable, given the differences in their respective roles in the investigation.  Moreover, the
jury apparently rejected the defense argument that discrepancies as to exactly which bags of
drugs were located on the table inside the garage rendered the officers' testimony unworthy of
belief.
        Finally, Dukes points to perceived inconsistencies between Officer Kapusniak's trial
testimony and statements made by Officer Scott Schweizer, who also participated in the search
of the garage, during the IAD investigation of the complaint Dukes filed against Officer Bonett.
Dukes's suggestion that Officer Kapusniak falsely testified that he (as opposed to Officer
Schweizer) recovered the items seized during the search is frivolous.  At trial, Officer Kapusniak
explained that both he and Officer Schweizer were involved in searching the garage and that it
was Schweizer who physically retrieved the items in the garage before handing them to
Kapusniak, who was close enough to Schweizer to see what he was picking up and looking at.
*See* Trial Tr. 232-34, Oct 21, 2008.  Dukes also contends Officer Kapusniak's testimony about
where in the garage the gun box was located conflicts with Officer Schweizer's claim to have
found the gun box in the front of the garage.  After reviewing the record, however, the Court
perceives no conflict.  *Compare* Dukes Ex. Y, at 6, ECF No. 212 (IAD July 28, 2008,
investigation report characterizing Schweizer as stating "he found a gun box in the garage along
with drugs, which were in the front of the garage"), *with* Trial Tr. 234, Oct. 21, 2008 (Officer
Kapusniak's testimony that the officers found the gun box "kind of off to the right" as the
officers were making their way "back up towards the front of the garage").

evidence Dukes has presented regarding the revelations of misconduct by Betts and Spicer is deeply troubling.  While the officers have not yet been convicted, they have been indicted on serious charges of conspiring to use their official positions to rob suspected drug dealers.  The decision by the U.S. Attorney's Office as early as 2010, and by the District Attorney's Office in December 2012, not to use the discredited officers as witnesses, and the District Attorney's decision to drop charges in a substantial number of cases in which the officers' testimony was necessary, speak volumes about the officers' lack of credibility.

As troubling as these revelations are, however, upon careful review of the record, this Court does not believe this evidence taints Dukes's conviction in this case.  Dukes argues the revelations impact his case because Betts's testimony was essential to this Court's suppression ruling.  As to the motion to suppress physical evidence, the Court disagrees.[21]  Betts and Spicer played no role in collecting any of the physical evidence against Dukes.  They were not involved in the surveillance or arrest of Dukes or in obtaining and executing a search warrant at 7705 Temple Road.  Rather, the officers interacted with Dukes only after the search warrant had been executed, when, at the suggestion of Officer Kapusniak, they met with Dukes and questioned him about other criminal activity of which he was aware.  At the suppression hearing, Dukes denied ever meeting with Betts and Spicer, and this Court relied in part on the contradiction between Dukes's denial and Betts's testimony that information Dukes provided led to the recovery of a shotgun from a location identified by Dukes in finding Dukes's version of events

---

[21] Betts's testimony was essential to the Court's denial of Dukes's motion to suppress statements he made to Betts and Spicer, as Dukes denied ever meeting with Betts and Spicer, much less making any statements to them.  Although the Court denied Dukes's suppression motion, neither Betts nor Spicer testified at trial, and the statements Dukes denied making were not admitted.

not credible.[22]  *See* Mem. 5, July 30, 2008, ECF No. 91.  Betts's testimony, however, was not the sole basis for the Court's credibility determination.  Moreover, the Court had independent reasons for crediting the testimony of Officer Bonett, whose account of the circumstances surrounding Dukes's arrest was critical to the finding of probable cause and whose account the jury apparently also believed.  Thus, even if the revelations regarding Betts and Spicer completely undermine Betts's testimony at the suppression hearing, because this evidence does not affect Officer Bonett's credibility, it also does not affect the Court's suppression ruling.

Although acknowledging that Officer Kapusniak is not among the group of former Narcotics Field Unit officers who have been charged criminally, Dukes argues Kapusniak is nevertheless implicated in the wrongdoing by those officers because he has been sued civilly alongside some of the discredited officers in cases alleging misconduct by the defendant officers, including, inter alia, planting evidence on suspects, falsely charging them with drug offenses, and preparing paperwork misrepresenting the events leading to the suspects' arrest.[23]  All of the civil suits of which this Court is aware involve allegations of misconduct by the named officers in 2011 and later, some five years after Officer Kapusniak obtained and executed the search warrant in this case.  Unlike the charges against Betts, Spicer, and the four other indicted officers, which date back 2006 and which a grand jury determined were supported by probable

---

[22] At the suppression hearing, the Government introduced the police 75-49 report and property receipt pertaining to the recovery of a shotgun from 7740 Temple Road, the address allegedly provided by Dukes, to corroborate Betts's account.

[23] Dukes has alerted the Court to one such civil suit via media coverage of the case.  *See* ECF No. 248 (enclosing a *Philadelphia Daily News* article describing the plaintiff's allegations in the civil suit *Barksdale v. Liciardello*, Civil No. 13-575 (E.D. Pa. filed Jan. 31, 2013)).  The Court is aware, via a search of the electronic case filing system, of approximately a dozen other similar lawsuits in which Officer Kapusniak has been sued civilly alongside certain of the discredited officers.

cause, the allegations against Officer Kapusniak concern a later time frame and are still merely allegations. In these circumstances, the Court finds the allegations do not support Dukes's claim that Officer Kapusniak provided false testimony and fabricated evidence in this case. *See Stevenson v. United States*, No. 11-49, 2012 WL 4965290, at *4 (D. Md. Oct. 16, 2012) (holding a pending civil lawsuit alleging police officers conspired to conduct an illegal search in a criminal case "fail[ed] to establish any proof of a deliberate falsehood in the search warrant affidavit in [an unrelated] case").[24]

Although Dukes frames his actual innocence claim primarily in terms of false testimony and fabricated evidence, the Court notes that, to the extent Dukes is also asserting a freestanding claim of actual innocence, he has not made the substantially more difficult showing required to establish such a claim. While neither the Supreme Court nor the Third Circuit has "resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence," *McQuiggan v. Perkins*, 133 S. Ct. 1924, 1931 (2013); *see also Sistrunk*, 674 F.3d at 187 n.2, the Supreme Court has suggested that insofar as such a claim is cognizable, the threshold showing for the claim would be "extraordinarily high," requiring "more convincing proof of innocence" than the showing required for a "gateway" claim of innocence pursuant to

---

[24] Dukes also points to two 2008 *Philadelphia Daily News* articles recounting that Officer Schweizer was disciplined for having racially offensive stickers inside his locker as "new evidence" of his actual innocence. *See* ECF No. 229, at 31-33. Dukes argues the evidence of Officer Schweizer's racism completely undermines his credibility and had the Government called Schweizer to testify about the search (as he contends it should have done), it is highly unlikely the jury would have convicted him. This argument lacks merit. Prior to trial, the Government moved in limine to exclude any reference to or evidence of the locker incident and another incident in Officer Schweizer's IAD file, and the Court granted the motion as to locker incident, finding the incident had low probative value as the Schweizer's potential bias, given the findings in the IAD report, and would be highly prejudicial. *See* Oct. 21, 2008, Order, ECF No. 124 (under seal). While the Court in no way condones the conduct underlying the locker incident, the incident does not support Dukes's claim of actual innocence.

*Schlup v. Delo*, 513 U.S. 298 (1995). *House v. Bell*, 547 U.S. 518, 555 (2006). Under the *Schlup* standard, the petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Id.* at 536-37 (quoting *Schlup*, 513 U.S. at 327). For the reasons set forth above, Dukes fails to meet this standard.

Under the rubric of actual innocence, Dukes also challenges the sufficiency of the evidence to support his conviction of the firearms offenses charged in Counts 3 and 4 (i.e., possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)). Specifically, Dukes contends the evidence at trial was insufficient to prove he constructively possessed the gun recovered from the garage at 7705 Temple Road.

A conviction under either § 922(g) or § 924(c) may be predicated on a defendant's constructive possession of a firearm. *See United States v. Caldwell*, 760 F.3d 267, 278 (3d Cir. 2014); *United States v. Walker*, 657 F.3d 160, 172 (3d Cir. 2011). The Third Circuit has defined constructive possession as follows:

> Constructive possession exists if an individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons. Constructive possession necessarily requires both dominion and control over an object and knowledge of that object's existence.

*Walker*, 657 F.3d at 172 (citation omitted).

The gun at issue in this case was recovered during a search of the same garage from which Officer Bonett observed Dukes dealing drugs on the evening of August 16, 2006, and from which crack and powder cocaine were also recovered. Indeed, when Officer Kapusniak and his partner opened the gun box, they found a packet of suspected crack cocaine inside,

identical in appearance to the other packets of suspected crack cocaine recovered from the garage. *See* Trial Tr. 234, Oct. 21, 2008. Dukes unquestionably had access to the garage. Not only was Dukes arrested after Officer Bonett observed him entering and exiting the garage, but Dukes's mother, the owner of the property at 7705 Temple Road, testified Dukes was the only person (besides herself) who had a key to the garage, *see id.* at 282,[25] and both Dukes's mother and Dukes's son (who also lived at 7705 Temple Road) testified Dukes was using the garage as an office to start some type of business in the summer of 2006, *see id.* at 286-87 (mother's testimony that Dukes was using the garage as an office to start some type of cleaning business); Trial Tr. 18-20, Oct. 22, 2008 (son's testimony that Dukes was using the garage for some kind of magazine business). Although the gun was registered to Dukes's son, who claimed the gun was his and his father did not know about it, there was ample reason to doubt this assertion. According to the son's testimony, he purchased the gun in April 2006 to protect himself and his grandmother after someone tried to break into the house, and thereafter stored the gun, unloaded, in the garage, checking on it once or twice a month. *See* Trial Tr. 18, 21, 27, 42, Oct. 22, 2008. When the gun was recovered during the search of the garage, however, it was fully loaded, *see* Trial Tr. 234, Oct. 21, 2008, suggesting someone had accessed it.[26] The presence of a packet of suspected crack cocaine inside the gun box suggests the person accessing the gun was Dukes. This evidence is more than sufficient for the jury to have found Dukes knew the gun was in the garage and exercised dominion and control over it in connection with his drug dealing.

---

[25] Dukes's mother also testified Dukes was living in her house in August 2006. *See id.* at 281.

[26] That someone was accessing the gun was corroborated by the Government's firearms expert, who testified there was lint in the barrel and six chambers of the gun, something he would not expect to see if the gun had been kept in a closed box, as Dukes's son claimed. *See* Trial Tr. 75-77, Oct. 22, 2008.

23

**B.** **Fourth Amendment Violations**

Dukes also seeks relief on the basis that the police violated his Fourth Amendment rights by arresting him without probable cause and searching the residence where he was arrested pursuant to a search warrant issued based on material misstatements and omissions of fact made in in bad faith, knowingly, and/or with reckless disregard for the truth. Dukes litigated these Fourth Amendment issues prior to trial, and after a hearing at which Dukes and Officers Bonett, Kapusniak, and Betts testified and were subjected to cross-examination, this Court denied Dukes's suppression motions and request for a *Franks* hearing, crediting the officers' testimony and finding Dukes's account of the circumstances surrounding his arrest not credible. Dukes also challenged his warrantless arrest and the validity of the search warrant on direct appeal, but the Third Circuit affirmed this Court's denial of his suppression motions. In so holding, the Third Circuit observed "[t]he only conceivable way in which Dukes might prevail on any of his claims that the police officers violated his constitutional rights is if his version of events were credited." *Dukes*, 387 F. App'x at 200. Noting the only evidence supporting Dukes's version of events was "his own testimony and a cell phone video, of dubious origin, which does not clearly depict anything other than 'gray and random flashes of light,' as the District Court aptly characterized it," the Third Circuit deferred to this Court's adverse determination of Dukes's credibility and held this Court "properly denied all of Dukes's motions to suppress physical evidence." *Id.* (record citation omitted).

The thrust of Dukes's Fourth Amendment argument in his § 2255 motion and later-filed amendments is that Officer Bonett's account of the circumstances leading up to and surrounding Dukes's arrest—which information supplied probable cause for the arrest as well as for the search warrant—was a lie. Most of the evidence that Dukes contends proves Officer Bonett

fabricated his story regarding Dukes's arrest—e.g., the cell phone video allegedly taken by Dukes's neighbor and the 75-48 and CAD reports—was presented at the suppression hearing and considered by this Court in evaluating Officer Bonett's and Dukes's credibility.  Insofar as Dukes argues this Court erred in evaluating and making credibility determinations based on the evidence presented at the suppression hearing, this issue is not an appropriate subject of collateral review, as § 2255 "generally may not be employed to relitigate questions which were raised and considered on direct appeal."  *United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993) (citation and internal quotation marks omitted); *see also United States v. Palumbo*, 608 F.2d 529, 533 (3d Cir. 1979) (holding "in the absence of newly discovered evidence that could not reasonably have been presented at the original trial, a change in applicable law, incompetent prior representation by counsel, or other circumstances indicating that an accused did not receive full and fair consideration of his federal constitutional and statutory claims, a § 2255 petitioner may not relitigate issues that were adjudicated at his original trial and on direct appeal" (footnotes and citations omitted)).

Dukes also offers new evidence which he contends supports his version of events and demonstrates Officer Bonett testified falsely at the suppression hearing, pointing to his cell phone records for August 16 and 17, 2006, the January 8, 2008, letter from AUSA Inden, Detective Hilliard's grand jury testimony, and the recent revelations of misconduct by former Officers Betts and Spicer and the civil suit against Officer Kapusniak.  As discussed at length in the preceding section, however, none of this evidence provides a basis for this Court to reconsider its earlier ruling.

C.      **Fifth Amendment Violations by the Court**

Dukes argues the Court violated his due process rights by (1) using his statement during allocution as the basis for an upward variance at sentencing, (2) abusing its discretion in making unspecified rulings adverse to Dukes, both before and during trial, including evidentiary rulings, and (3) failing to declare a mistrial "after two jurors observed [him] in shackles during a recess." *See* ECF No. 193-1, at 4.

Dukes's challenge to the upward variance imposed at his original sentencing is now moot in light of the sentence reduction this Court granted in July 2012. As noted, following a sentencing reduction hearing, this Court sentenced Dukes to a term of imprisonment within the reduced effective advisory Guidelines range of 180 to 210 months, eliminating in its entirety the 65-month upward variance the Court had previously imposed. Because Dukes is no longer subject to an upward variance, his challenge to the variance previously imposed is moot.

Dukes has also failed to show a due process violation resulting from this Court's evidentiary and other rulings. In his § 2255 motion, Dukes alleges this Court "abused its discretion in making rulings adverse to [him] before and during trial, including but not limited to evidentiary rulings," *id.*, but does not identify the particular rulings he is challenging, much less explain how the rulings denied him due process. Dukes's conclusory allegations does not provide a basis for relief.[27]

Dukes's claim that the Court violated his due process rights by failing to grant a mistrial after two jurors allegedly observed him in shackles is also without merit. As the Government notes, the record reflects that during the lunch break following closing arguments, one of the alternate jurors returned to the courtroom, apparently looking for someone to sign for the jurors'

---

[27] This claim is also procedurally defaulted because Dukes failed to challenge any of the Court's evidentiary rulings on direct appeal. *See Bousley v. United States*, 523 U.S. 614, 622 (1998).

lunch.  *See* Trial Tr. 90, Oct. 23, 2008.  Because the juror entered the courtroom while Dukes was being handcuffed, defense counsel promptly brought the incident to the Court's attention. *See id.*  At both counsels' suggestion, the Court conducted a brief colloquy with the juror in question, who explained she had entered the courtroom "to find a person who could sign for the [lunch] bill" so the jury could eat.  *See id.* at 93.  The juror denied having seen anything unusual or anything that would influence her decision in any way while in the courtroom.  *See id.* at 93-94.  After the colloquy, the Court directed the juror to return to the jury room and not to discuss the colloquy with the other jurors, *see id.* at 94, and, as an alternate, the juror did not ultimately participate in deliberations.  On this record, it is not clear whether the juror in question actually observed Dukes in handcuffs.  Even assuming she did, however, there is no basis to conclude this brief glimpse by a non-deliberating juror prejudiced Dukes in any way; hence, a mistrial was not warranted.  *See United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974) (noting "[t]he fact that jurors may briefly see a defendant in handcuffs is not so inherently prejudicial as to require a mistrial" and holding a mistrial was not required based on the jury having "briefly glimpsed" a defendant being brought into the courtroom in handcuffs).

**D.     Prosecutorial Misconduct**

Dukes also argues the prosecutor violated his due process rights by ignoring and failing to investigate his allegations of police misconduct, knowingly presenting fabricated evidence and perjured testimony at trial, ignoring inconsistent police accounts regarding the location of physical evidence, and making unspecified material misstatements to an IAD investigator from the Philadelphia Police Department.  In addition, Dukes accuses the prosecutor of withholding exculpatory evidence—his cell phone records—which allegedly would have supported Dukes's version of events.  None of these claims has merit.

27

As an initial matter, as the Government notes, because Dukes failed to raise his prosecutorial misconduct claims on direct appeal, the claims are procedurally defaulted and cannot be raised on collateral view, absent a showing of cause and prejudice or actual innocence, neither of which Dukes has made.  *See Bousley v. United States*, 523 U.S. 614, 622 (1998).

As to the merits of the claims, contrary to Dukes's assertion that his allegations of police misconduct were ignored, the allegations were fully vetted by the Police Department's Internal Affairs Division, which issued a report exonerating Officer Bonett of Dukes's allegations that Bonett planted drugs in the garage of 7705 Temple Road and fabricated his account of observing Dukes's selling drugs in order to arrest Dukes.  *See* Dukes Ex. Y, at 10, ECF No. 212.  Dukes does not identify any misstatements the AUSA made to the IAD investigator, and, after reviewing the IAD report, this Court has not identified any.[28]

As discussed at length above, Dukes's allegations that Officers Bonett and Kapusniak testified falsely and fabricated evidence against him were rejected by this Court at the suppression hearing and by the jury at trial, and Dukes has provided no new evidence casting doubt on the Court's and the jury's credibility determinations.  Because there is no basis to conclude these witnesses provided false testimony or fabricated evidence, there is also no basis to conclude the Government knowingly presented false evidence at trial.  In a later-filed amendment to his § 2255 motion, Dukes argues the Government permitted Detective Hilliard to testify before the grand jury that the gun recovered from the garage at 7705 Temple Road belonged to a deceased person, knowing the gun was actually registered to Dukes's son.  *See* ECF No. 241.  While Detective Hilliard initially testified the original owner of gun was

---

[28] The IAD report indicates the AUSA spoke with the IAD investigator about the cell phone video allegedly taken by Dukes's neighbor and told him no one could be identified from the video, *see* Dukes Ex. Y, at 8, ECF No. 212, but this statement is entirely consistent with this Court's review of the video evidence.

deceased, *see* Grand Jury Tr. 16, Mar. 13, 2007, she later testified she had learned the gun had been purchased by Dukes's son, *see* Grand Jury Tr. 5, Mar. 27, 2007, thereby correcting any misinformation.  Dukes also asserts the Government engaged in misconduct by calling Officer Kapusniak to testify about the search of the garage, even though Officer Schweizer described himself to the IAD investigator as the "main searcher," *see* Dukes Ex. Y, at 6, ECF No. 212, arguing the Government improperly sought to falsely portray Kapusniak as the person who recovered the evidence so as to avoid any revelations of the racially charged incident involving Schweizer.  *See* ECF No. 214.  The Court perceives no impropriety.  As set forth above, Officer Kapusniak explained his and Officer Schweizer's roles in conducting the search, and the Court ruled the racially charged incident inadmissible in any event.

Finally, Dukes's assertion that the Government committed a *Brady* violation by withholding his cell phone records lacks merit because, as set forth above, the cell phone records were neither withheld nor exculpatory.

**E.      Ineffective Assistance of Trial and Appellate Counsel**

Dukes argues he was denied his Sixth Amendment right to effective assistance of counsel, alleging the three lawyers who represented him in the proceedings in this Court and the lawyer who represented him on direct appeal were constitutionally ineffective in numerous respects.  To establish a claim of ineffective assistance of counsel, a defendant must show (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

With respect to the deficiency element, the defendant must demonstrate "counsel's representation fell below an objective standard of reasonableness," which requires "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment." *Id.* at 687-88.  In evaluating counsel's performance, the court must be "highly deferential" and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see also id.* at 690 (observing the court must determine whether, in light of all the circumstances, the acts or omissions identified by the defendant "were outside the wide range of professionally competent assistance").

To establish prejudice, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Under this standard, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Because a defendant must show both deficient performance and prejudice to prevail on an ineffective assistance of counsel claim, a court reviewing such a claim need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.  Thus, a court may dispose of an ineffective assistance of counsel claim based on a lack of sufficient prejudice without addressing whether counsel's performance was deficient. *See id.*

### 1.    Attorney Toplin

The main deficiency Dukes identifies in Attorney Toplin's performance is her filing of a suppression motion, without Dukes's knowledge, which allegedly conceded his involvement in drug crimes.  This allegation is baseless.  The motion in question argued the facts alleged by the police demonstrated their warrantless arrest of Dukes was not supported by probable cause, requiring suppression of the firearm and drug paraphernalia discovered in the garage.  Although the motion assumed *arguendo* that the facts the officers claimed to have gathered in their

surveillance of Dukes may have showed his involvement in an illegal transaction, *see* Def.'s Mem. in Supp. of Mot. to Suppress Physical Evidence 5, ECF No. 16, the motion did not concede any such transaction occurred. Attorney Toplin did not act objectively unreasonably in arguing that, even accepting the police officers' version of the facts as true, suppression of the physical evidence was required. Moreover, Dukes has not shown he was prejudiced by this argument in any way, as Attorney Brennan later supplemented the motion to suppress with a request for a *Franks* hearing and actively challenged the officers' version of events at the suppression hearing in June 2008.

Dukes also identifies other alleged deficiencies in Attorney Toplin's performance, including that she ignored her own investigator's discovery of exculpatory evidence of his actual innocence,[29] failed to conduct an investigation that would have corroborated his allegations of actual innocence and police misconduct, and failed object to the admission of certain testimony and evidence. Dukes cannot show he was prejudiced as a result of any of these perceived deficiencies, however, as the Federal Defender Office withdrew from his case in August 2007, ten months before the suppression hearing and more than a year before trial, and any duty to investigate and engage in further motions practice thus fell to Dukes's successor attorneys.

### 2.     Attorney Brennan and Attorney Joseph

Dukes makes a host of complaints about both Attorney Brennan's and Attorney Joseph's performance. Because Dukes raises many of the same perceived deficiencies as to both attorneys, the Court will address the common allegations together.

---

[29] Although Dukes's motion does not specify what exculpatory evidence the investigator supposedly discovered, elsewhere in his submissions, he asserts an investigator from the Federal Defender Office retrieved the cell phone containing the allegedly exculpatory video of his arrest from his neighbor, Reginald Dales, in June 2007. *See* ECF No. 211, at 9. As both this Court and the Third Circuit concluded after viewing the cell phone video, the video is not exculpatory.

Dukes argues both lawyers were ineffective for failing to adequately investigate and present exculpatory evidence which would have corroborated his version of events and demonstrated the veracity of his claims of fabricated evidence and police misconduct. Dukes faults both attorneys for failing to subpoena Reginald Dales, the neighbor who allegedly captured his arrest on a cell phone video, to testify at the suppression hearing and at trial; failing to obtain an expert to authenticate the cell phone video; and failing to use other documentary evidence, such as the CAD report and Officer Kapusniak's field test report, to show the evidence against him was fabricated.[30]

Insofar as Dukes argues his attorneys were ineffective for failing to interview or subpoena Dales, the claim lacks merit because, even assuming the attorneys made no effort to contact Dales, Dukes has not shown he was prejudiced by the failure. In his reply brief, Dukes makes the self-serving allegation that had his attorneys interviewed Dales, they would have learned he could testify that on the evening of August 16, 2006, prior to 10:30 p.m., he went onto his back porch and saw both an undercover and a marked police car in the alley and undercover police officers running in and out of the garage at 7705 Temple Road while Dukes sat in the back of the marked police car. *See* ECF No. 229, at 21. Dukes also alleges Dales could testify he captured what he could of the raid on his cell phone. *See id.* at 22. Although Dukes claims Dales waited for an attorney to contact him, Dukes does not say Dales would have been willing to testify on his behalf at either the suppression hearing or trial, and has not submitted an affidavit from Dales to this effect. Nor has Dukes submitted an affidavit from Dales regarding the substance of the testimony he allegedly could have provided. Dukes's self-serving

---

[30] Dukes also faults his attorneys for failing to obtain his cell phone records, but Dukes cannot show prejudice from this failure because, as set forth above, the records do not support his version of events.

allegations are insufficient to establish prejudice stemming from the failure to interview or subpoena Dales. *See Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001) (holding a habeas petitioner failed to establish prejudice resulting from his attorney's alleged failure to interview a witness where the petitioner "fail[ed] to present any sworn testimony by [the witness]"); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (holding "evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit"); *United States v. Dawson*, 857 F.2d 923, 928-29 (3d Cir. 1988) (holding a district court erred in dismissing without an evidentiary hearing a defendant's claim that his trial counsel was ineffective for failing to interview witnesses from whom the defendant submitted affidavits, but did not err in dismissing the claim as to witnesses from whom affidavits were not submitted). As the Government notes, moreover, it is not reasonably probable that Dales's testimony would have led to a different outcome because the cell phone video does not corroborate Dukes's version of events.

Dukes's claim based on his attorneys' failure to obtain an expert to authenticate the cell phone video is also meritless. Given the dubious quality of the video, Dukes has not shown counsel's decision to not expend resources on an expert falls outside the wide range of reasonable professional assistance. Moreover, any suggestion that expert assistance would have rendered the video helpful in corroborating Dukes's version of events is entirely speculative.

As to the documentary evidence Dukes contends supports his claims of fabrication, both Attorney Brennan and Attorney Joseph used such evidence in an effort to establish the police were lying, contrary to Dukes's assertion. Specifically, both attorneys sought to impeach Officer Bonett's account of having arrested Dukes at 10:50 p.m. after observing him engage in drug transactions with the 75-48 and CAD reports, suggesting through their questioning that Dukes

must have been in police custody by 10:25 p.m., the "occurrence" or "dispatch" time reflected in the reports. *See* Hr'g Tr. 34-41, June 19, 2008; Trial Tr. 128-29, Oct. 21, 2008. At trial, Attorney Joseph also called Carmen Soriano of the police department's tape reproduction unit to establish that the CAD report showed Officer Bonett called in to the dispatcher at 10:25 p.m. and again at 10:32 p.m., which counsel argued would only make sense if Dukes was in custody by 10:25 p.m. *See* Trial Tr. 171-75, Oct. 22, 2008; Trial Tr. 44-45, Oct. 23, 2008. In addition, Attorney Joseph highlighted the inconsistency between Officer Kapusniak's testimony regarding the duration of the search of 7705 Temple Road and the time of his field test report at trial. *See* Trial Tr. 267-69, Oct. 21, 2008.[31] Because counsel did, in fact, use the documentary evidence cited by Dukes in an effort to bolster Dukes's version of events, Dukes has failed to establish any deficiency in his attorney's performance as to the use of the documents.

Relatedly, Dukes asserts his attorneys were ineffective for failing to raise issues regarding the location where certain physical evidence was recovered, which may have had some bearing on the Court's and the jury's credibility determinations. This argument is also contradicted by the record. On cross-examination, both attorneys sought to impeach Officer Kapusniak's statement that he found one green-tinted packet of suspected crack cocaine inside the gun box with his earlier preliminary hearing testimony that the single packet was on the floor. *See* Hr'g Tr. 85-87, June 19, 2008; Trial Tr. 257-63, Oct. 21, 2008. Moreover, in closing argument, Joseph also suggested Officer Wiley may have planted Dukes's driver's license inside

---

[31] Although Attorney Brennan did not highlight this particular inconsistency in Officer Kapusniak's testimony, he used the documentary evidence during the suppression hearing to impeach Officer Bonett, whose account of the events leading up to Dukes's arrest was critical to the Court's finding of probable cause. Particularly in view of Officer Kapusniak's later trial testimony that the time on the field test report was a mistake, it is not reasonably probable that this inconsistency would have altered the Court's suppression ruling.

the residence at 7705 Temple Road when he entered the house with the wallet in his possession after Dukes's arrest.  *See* Trial Tr. 59-60, Oct. 23, 2008.

Dukes also maintains the attorneys were ineffective for failing to impeach Officer Bonett's testimony that the police were unable to apprehend the other parties to Dukes's drug transactions due to a lack of backup and to make adequate use of AUSA Inden's admission that the police knew there was a firearm in the garage at the time of Dukes's arrest.  Dukes's assertion that his attorneys could have impeached Officer Bonett's testimony regarding the lack of backup is based solely on AUSA Inden's January 8, 2008, letter to Attorney Brennan, in which Inden noted there were "many other officers on the scene," who had "arrived in response to the request for backup that was made upon the arrest of Dukes."  Dukes Ex. S, ECF No. 212. As the Government notes, the availability of other officers to assist in securing the scene after Dukes's arrest in no way undermines Officer Bonett's testimony that the police did not have sufficient manpower to remove multiple backup units from police call rotation for an extended period.  Indeed, Officer Bonett stated at trial there were other officers besides his unit assigned to his district on the night of August 16, 2006.  *See* Trial Tr. 114-15, Oct. 21, 2008.  In any event, Dukes has not shown the failure to produce evidence that backup was available prejudiced him, as Attorney Brennan and Attorney Joseph were able to impugn the credibility of Officer Bonett's failure to pursue the suspected drug purchasers on other grounds.  *See* Hr'g Tr. 44-45, June 19, 2008 (highlighting Officer Bonett's failure to make any effort to track the suspected purchasers by recording their license plate numbers, even though he was able to see them); Trial Tr. 113, Oct. 21, 2008 (same).[32]

---

[32] Dukes also argues both attorneys were ineffective for failing to obtain police records that allegedly would have shown Officer Bonett and his partners were actually working undercover

As to Dukes's claim his attorneys failed to make adequate use of AUSA Inden's statement, also in the January 8, 2008, letter, that Sergeant David Merrick, who arrived on the scene after Dukes was arrested, recalled being told by another officer that Dukes said there was a gun somewhere in the garage, Dukes does not specify how his attorneys should have used this statement or explain how the failure to use it prejudiced him in any way. To the contrary, at trial Dukes sought to preclude Sergeant Merrick from testifying about Dukes's knowledge of a gun in the garage. *See* Trial Tr. 158-61, Oct. 21, 2008.

Dukes also faults both attorneys for not seeking to preclude the Government from introducing testimony regarding suspected father and son drug dealing.[33] As the Government notes, the tip Officer Bonett claimed to have received from a reliable confidential source was what prompted him to conduct surveillance at 7705 Temple Road and was therefore relevant to this Court's consideration of the suppression issue. Although Attorney Brennan had no basis to seek to preclude Officer Bonett from testifying about the tip,[34] he vigorously cross-examined Bonett about it, highlighting the lack of any description from the source of the alleged drug-dealing father and son and Bonett's lack of specificity about the reliability of the information provided by the source in the past, *see* Hr'g Tr. 50-57, June 19, 2008, and arguing the lack of corroboration regarding the source and his or her reliability required that the evidence be

---

on the night of August 16, 2006, but provides no basis to conclude the records would show what he claims.

[33] Dukes's suggestion that Attorney Toplin was also ineffective for this reason is ludicrous given that Toplin withdrew from representing Dukes some ten months before the suppression hearing.

[34] While Dukes contends the allegations of father and son drug dealing did not surface until the suppression hearing, police reports prepared shortly after Dukes's arrest indicated that Officer Bonett and his partners went to 7705 Temple Road to investigate a tip from a concerned citizen about illegal narcotic sales out of the rear garage at the property. *See, e.g.*, Dukes Ex. D, ECF No. 212.

suppressed, *see id.* at 150-52.  At trial, moreover, Attorney Joseph incorporated the tip into the defense theory, arguing the tip prompted the police to simply arrest the first person they saw at 7705 Temple Road and then to fabricate a story about observing drug dealing to justify their illegal search of the premises.  Attorney Joseph also used to tip to support his theory that the drugs recovered from the garage, like the gun, belonged to Dukes's son, whom the police failed to investigate.  Because the record demonstrates Attorney Joseph's failure to object to the testimony about father and son drug dealing was a reasonable strategic decision, Dukes cannot show the deficiency element of an ineffective assistance of counsel claim.

Dukes's claim that Attorney Brennan and Attorney Joseph were ineffective for failing to challenge this Court's factual findings in its suppression ruling is baseless. Dukes does not identify any basis on which his attorneys should have challenged the findings, which the Third Circuit affirmed, and has not shown a reasonable probability such a challenge would have been successful.

Dukes's claim that his attorneys were ineffective for failing to challenge the admission of the notes Officers Betts and Spicer took during their meeting with Dukes the day after his arrest is also without merit.  Attorney Brennan cross-examined Betts during the suppression hearing about the notes and the lack of any other written documentation of his interview of Dukes in arguing Dukes's motion to suppress any statements made to Betts and Spicer.  And the notes were never ultimately admitted at trial, as neither Betts nor Spicer testified.

Dukes identifies several additional deficiencies in Attorney Brennan's performance, alleging Brennan "failed to challenge the inadequate identification of the suspected drug dealer sighted by police and the resulting absence of probable cause to seize [Dukes]," abandoned Dukes's theory of the case, failed to adequately prepare Dukes's case, and failed to obtain a

*Franks* hearing.  *See* ECF No. 193, at 8; ECF No. 193-1, at 1-2.  As to the first of these allegations, the Court perceives no identification issue in this case.  The remaining allegations are refuted by the record of the suppression hearing, at which Attorney Brennan vigorously cross-examined the Government's witnesses, presented Dukes's version of events and the cell phone video, and argued both that Dukes's very specific alternative account of the events on the evening of August 16, 2006, showed Officer Bonett made material misstatements of fact regarding Dukes's arrest and that, even if the Court were disinclined to believe Dukes, the officers lacked probable cause for the arrest and ensuing search.  That Attorney Brennan's efforts to obtain a *Franks* hearing were ultimately unsuccessful does not render his performance deficient.

Dukes also makes a number of additional allegations against Attorney Joseph, many of which are too vague and conclusory to warrant relief.  Dukes faults Attorney Joseph for failing to object to instances of prosecutorial misconduct at trial without identifying the misconduct to which he is referring, and asserts Joseph gave inadequate opening and closing arguments without identifying any particular deficiencies in counsel's arguments or explaining why it is reasonably probable that better arguments would have produced an acquittal.  In fact, Joseph's closing argument was not only constitutionally adequate, but rebuts Dukes's assertion that Joseph failed to advance a defense theory of the case.  Consistent with the theory presented at the suppression hearing, on direct appeal, and in the instant § 2255 motion, Joseph argued to the jury in closing that the charges against Dukes were the product of shoddy police work by officers eager to justify their unlawful arrest of Dukes, the first person they saw at 7705 Temple Road, after finding drugs in the garage.  Highlighting the various inconsistencies in the record and the failure of the police to investigate Dukes's son, who admittedly owned the gun, Attorney Joseph argued

there was ample reason to doubt that Officer Bonett observed Dukes engaging in drug transactions prior to arresting him, and that either the drugs or the gun recovered from the garage belonged to Dukes. While the jury did not accept the defense theory, Dukes's argument that Joseph failed to present such a theory lacks merit.

Dukes's allegations of ineffectiveness based on Attorney Joseph's failure to move for a mistrial after Dukes was seen being shackled during a recess and failure to file post-verdict motions on his behalf are also meritless. As explained above, the juror incident did not warrant a mistrial; hence, Dukes cannot show prejudice from Joseph's failure to seek such relief. Dukes's claim regarding post-verdict motions fails because Dukes has not identified any issues Joseph should have raised, much less shown there is a reasonable probability that had Joseph filed such motions, this Court would have granted them.

The record does not support Dukes's claim that Attorney Joseph was ineffective for failing to argue fingerprint evidence would have excluded Dukes of any contact with the seized physical evidence. Contrary to Dukes's assertion, Attorney Joseph made effective use of law enforcement's failure to fingerprint the physical evidence in this case. Joseph cross-examined Officer Kapusniak regarding his failure to make any attempts to fingerprint the gun box, the gun itself, or any of the other property recovered in the search, or to preserve these items for later fingerprinting. *See* Trial Tr. 270-72, Oct. 21, 2008. Joseph also cross-examined the Government's experts about the possibility of obtaining fingerprints from the seized items, winning concessions that it might have been possible to obtain fingerprints from some, but not all, of those items. *See* Trial Tr. 79-81, 118-20, Oct. 22, 2008. Joseph then argued in closing that the failure to fingerprint the evidence provided a reason to doubt that the items seized from the garage belonged to Dukes. *See* Trial Tr. 60-61, Oct. 23, 2008. Dukes does not provide any

basis to conclude Joseph's use of the lack of fingerprint evidence was objectively unreasonable or that it prejudiced him in any way.

Dukes also faults Attorney Joseph for failing to object to the admission of certain evidence at trial, including two items from Dukes's wallet that were not specifically listed on the property receipt for the wallet (a credit card in the name of Dukes's son, Charles S. Dukes, and a business card from Lock's Gun Shop) and photographs of the alley behind 7705 Temple Road that case agent Detective Plummer took during trial.  Dukes argues Joseph should have objected to the admission of the credit card and business card based on the Government's failure to establish a chain of custody for the wallet.  As the Government notes, Joseph did initially raise a chain-of-custody objection to the admission of the wallet, noting he and Dukes had not had an opportunity to review the wallet's contents.  *See* Trial Tr. 76-78, Oct. 21, 2008.  In light of Joseph's objection, the Court admitted the wallet conditionally to permit Dukes to review its contents.  *See id.* at 78-79.  Following that review, Joseph did not make a further objection on chain of custody grounds.  Instead, he vigorously cross-examined the case agent about his and his predecessors' failure to note the existence of the credit card or the business card in any of their reports and the failure of the arresting officers to note these items on the property receipts. *See* Trial Tr. 138-40, Oct. 22, 2008.  He also re-called Dukes's son, who testified he kept the business card from the gun store where he purchased the gun in the gun case.  *See id.* at 184-85. Consistent with the defense theory that the police fabricated evidence against him to justify their unlawful search, Joseph argued in closing that the belated discovery of these items in Dukes's wallet was more of the same.  *See* Trial Tr. 58-59, Oct. 23, 2008.  Given these circumstances, Dukes cannot establish either that Joseph's failure to renew his chain-of-custody objection fell outside the wide range of reasonable professional assistance or a reasonable probability that had

Joseph made such an objection, the Court would have excluded the evidence.[35]  As to Detective Plummer's photographs, Dukes has not shown that Joseph had any basis to object to this evidence, or that, had he objected, it is reasonably probable the Court would have excluded it and the jury would have acquitted him.

Finally, Dukes argues Attorney Joseph had an actual conflict of interest that prevented him from providing effective representation at trial because the inmate who promised to pay him for representing Dukes failed to do so.  Dukes alleges Joseph threatened to withdraw from the case prior to trial unless he was paid.  Although Joseph did not follow through with the threat, Dukes maintains Joseph thereafter failed to zealously represent him because he was not paid.

A defendant seeking to establish ineffective assistance of counsel based on his attorney's breach of the duty of loyalty and failure to avoid conflicts of interest "must establish that an actual conflict of interest adversely affected counsel's performance."  *Gov't of the V.I. v. Zepp*, 748 F.2d 125, 134 (3d Cir. 1984).  An actual conflict exists if, during the course of the representation, "trial counsel's interest and the defendant's interest diverge[d] with respect to a material factual or legal issue or to a course of action."  *Id.* at 136 (alteration in original) (citation and internal quotation marks omitted).

The record refutes any suggestion that there was an actual conflict that adversely affected Joseph's performance at trial in this case.  During the course of the trial, in which this Court had ample opportunity to observe Joseph's performance, the Court repeatedly commented on the "great job" Joseph was doing on behalf of Dukes.  *See* Trial Tr. 11, 157, Oct. 22, 2008.

---

[35] The Court notes in this regard that although the property receipt may not have specifically mentioned a credit card in the name of Charles S. Dukes, Officer Wiley testified the wallet contained "13 credit cards with different names or initials on [them]."  Trial Tr. 197, Oct. 21, 2008.

Notwithstanding the third party's failure to pay him, Joseph effectively cross-examined the Government's witnesses, called witnesses and admitted evidence in Dukes's defense, and offered a viable defense, consistent with Dukes's own theory of the case. Joseph did not seek to withdraw from the representation until after trial, when Dukes accused him of failing to make his best efforts because he was not being paid, and, as an alternative to withdrawing, Joseph requested that the Court appoint him to represent Dukes as CJA counsel. After conferring with Joseph during the hearing on the motion, Dukes advised the Court he wanted Joseph to continue to represent him at sentencing and on appeal, notwithstanding his earlier accusations. Given this Court's firsthand observation of Joseph's zealous advocacy at trial and Dukes's agreement to have Joseph continue to represent him following trial, there is no basis to conclude Joseph's lack of compensation adversely affected his representation of Dukes in any way.

### 3. Attorney Greenberg

Dukes argues Attorney Greenberg was ineffective for failing to raise on appeal his actual innocence, the insufficiency of the evidence to show Dukes constructively possessed the firearm recovered from the garage where he was arrested, and this Court's failure to grant a mistrial after a juror observed him in shackles. Dukes also argues his appellate attorney was ineffective for failing to file a petition for certiorari in the Supreme Court challenging the 65-month upward variance imposed at sentencing and for failing to seek rehearing and/or rehearing en banc of the panel's resolution of his direct appeal. None of these issues has merit.

After reviewing Dukes's claims regarding his actual innocence, the sufficiency of the evidence of constructive possession, and the failure to grant a mistrial, this Court has concluded the claims lack merit for the reasons set forth above. Because these issues lack merit, Dukes cannot show that his counsel acted objectively unreasonably in failing to raise them on appeal or

a reasonable probability that had counsel raised the issues, he would have prevailed.  *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see also id.* at 288 (noting appellate counsel "need not (and should not) raise every nonfrivolous claim," and suggesting that to show appellate counsel acted objectively unreasonably in failing to raise an issue, a defendant would have to show the issue not raised was both nonfrivolous and "clearly stronger than issues that counsel did present" (citing *Jones v. Barnes*, 463 U.S. 745 (1983), and *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986))).

Insofar as Dukes challenges Attorney Greenberg's failure to seek certiorari review of this Court's upward variance in the Supreme Court, the issue is moot as this Court eliminated the variance by imposing a within-Guidelines sentence when ruling on Dukes's sentence reduction motion.  Dukes also has not shown either that his counsel acted unreasonably in not filing a petition for rehearing or rehearing en banc or that the failure to seek rehearing prejudiced him in any way.  Petitions for rehearing and rehearing en banc are not favored in the Third Circuit, and the Court of Appeals has made clear that appellate counsel, "having appropriately briefed and argued an appeal, is not under an obligation to file a petition for rehearing or rehearing en banc." *United States v. Coney*, 120 F.3d 26, 27 (3d Cir. 1997); *see also* 3d Cir. L.A.R. 35.4 (2008). Rather, "[t]he determination whether to file rests in the sound professional judgment of the attorney in light of all circumstances."  *Coney*, 120 F.3d at 27-28.  Such circumstances include the requirements of Local Appellate Rule 35.1, which mandates that counseled petitions for rehearing en banc include the following statement of counsel:

> I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to decisions of the United States Court of Appeals for the Third Circuit or the Supreme Court of the United States, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court, *i.e.*, the panel's decision is contrary to the decision of this court or the Supreme Court in [citing specifically the case or cases], OR, that this

appeal involves a question of exceptional importance, *i.e.*, [set forth in one sentence].

3d Cir. LAR 35.1.  The Third Circuit's disposition of Dukes's appeal comes nowhere close to meeting this standard; hence, his appellate counsel acted well within his discretion in not seeking rehearing or rehearing en banc.  *See United States v. Hall*, No. 06-2-1, 2010 WL 1816796, at *6 (E.D. Pa. May 4, 2012) (denying ineffective assistance of counsel claim based on appellate counsel's failure to file a petition for rehearing or rehearing en banc where the denial of the defendant's appeal was not contrary to any decision of the Supreme Court or the Third Circuit and his claims did not raise any questions of exceptional legal importance).

For all of the foregoing reasons, Dukes's § 2255 motion is denied.  An appropriate order follows.

BY THE COURT:


   /s/ Juan R. Sánchez
Juan R. Sánchez, J.